IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TRACEY L. HAMPTON,                )
                                  )
        Plaintiff,                )        Civil Action No. 09-327
                                  )
        v.                        )        Judge Donetta W. Ambrose
                                  )        Magistrate Judge Lisa Pupo Lenihan
GEICO GENERAL INSURANCE CO.,      )
                                  )        ECF No. 27
        Defendant.                )
                                  )

**REPORT AND RECOMMENDATION**

**I.  RECOMMENDATION**

It is respectfully recommended that the Motion for Summary Judgment (ECF No. 27) filed by Defendant, GEICO General Insurance Company, be granted.

**II.  REPORT**

Plaintiff, Tracey L. Hampton ("Hampton" or "Plaintiff"), instituted this action against her automobile insurance carrier, GEICO General Insurance Company ("GEICO" or "Defendant"), for breach of contract, bad faith pursuant to 42 Pa. Cons. Stat. §8371, and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P. S. § 201.1 *et seq.* This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a), 1441(b).  Venue in this District is proper under 28 U.S.C. § 1441(a).

Four issues are presented in the pending summary judgment motion:  (1) whether GEICO breached its insurance contract with Plaintiff when it discontinued payment of first party medical benefits based on the results of a peer review and a reconsideration, pursuant to §1797(b) of the Motor Vehicle Financial Responsibility Law ("MVFRL"); (2) whether Plaintiff can still pursue a

bad faith claim where she has failed to prove breach of contract; (3) whether Plaintiff's bad faith

claim is precluded by §1797 of the MVFRL, which provides the exclusive means for a plaintiff

to seek redress for an insurer's denial of a first party benefits claim; and (4) whether GEICO's

conduct constitutes merely nonfeasance, as opposed to misfeasance, and therefore the UTPCPL

does not provide Plaintiff with a private cause of action.  Because the Court finds that no

material issues of fact exist and Defendant GEICO is entitled to judgment as a matter of law, the

Court recommends that GEICO's Motion for Summary Judgment be granted.

### A.      Facts and Procedural History

The material facts are not disputed.[1]  At all relevant times, Plaintiff was insured by GEICO

on a policy of automobile insurance providing, among other things, first party medical benefit

coverage.   (Compl. at ¶3; GEICO Family Automobile Policy Renewal Declarations ("Renewal

Decl.") at 2,  Def.'s Ex. "A," ECF No. 30-1.)  Specifically, GEICO provided Plaintiff with first party

medical coverage benefits of $100,000.00, as well as providing for extraordinary medical benefits,

with the latter providing up to $1,000,000.00 in available medical coverage related to injuries

sustained in an automobile accident.  (Renewal Decl. at 2.)

On February 17, 2006, Plaintiff was operating one of her insured vehicles when she was rear-

ended by another driver. (Compl. at ¶5.)    Plaintiff allegedly sustained personal injuries in the

accident for which she sought medical treatment. (Compl. at ¶¶6-7.)  GEICO paid for Plaintiff's

---

[1]Plaintiff failed to file a responsive concise statement which responds to each numbered paragraph in
Defendant's concise statement of material facts, admits or denies whether each such fact is undisputed
and/or material, and sets forth the basis for the denial with appropriate reference to the record, as required
by LCvR 56.C.1.  Consequently, pursuant to LCvR 56.E, the court deems admitted, for purposes of
summary judgment, Defendant's allegations of fact unless specifically denied or otherwise controverted
by Plaintiff's separate concise statement, but only to the extent Plaintiff cites in support of such contrary
statements evidence in the record (other than her own pleadings) that support her allegations.  LCvR
56.B.1.; Fed.R.Civ.P. 56(e)(2).

medical treatment for approximately six months after the accident without questioning the reasonableness or medical necessity of the treatment. (Compl. at ¶8.)

Immediately following the accident, Ms. Hampton sought medical attention at the Emergency Department of UPMC-Presbyterian, at which time she was diagnosed as having cervical and lumbar strain and sprain with pain noted in her left shoulder and upper left arm. (Pl.'s Ex. 1, ECF No. 36-1.) Thereafter, she was seen by her PCP, Cynthia G. Ayers, M.D., on March 13, 2006, at which time, Dr. Ayers noted the existence of muscle spasms in her neck and upper back, and diagnosed muscular contusions of the trapezius and left posterior cervical area. (Pl.'s Ex. 2, ECF No. 36-2.) Dr. Ayers prescribed anti-inflammatory, pain and muscle relaxant medications and a course of physical therapy. In addition, prior to the March 13th office visit, it appears that Dr. Ayers ordered X-rays of Plaintiff's cervical spine and left shoulder on February 23, 2006. The Radiology Report dated February 23, 2006 revealed evidence of mild arthritic changes in the left shoulder area; X-rays of the cervical spine were unremarkable. *Id.*

On March 7, 2006, Plaintiff was examined by Thomas D. Kramer, M.D., an orthopedic specialist, apparently upon Dr. Ayers' referral. Dr. Kramer also reviewed the X-rays of Plaintiff's cervical spine and left shoulder from February 23, 2006. Plaintiff complained of neck pain and headaches. Dr. Kramer observed upon physical examination obvious spasm palpated on the lower cervical region bilaterally. He diagnosed her condition as cervical and thoracic strain, and ordered an MRI and physical therapy of the cervical spine. (Pl.'s Ex. 3, ECF No. 36-3.)

Plaintiff was again seen by Dr. Kramer for a follow-up visit on April 4, 2006, at which time Dr. Kramer noted her complaints of pain were mainly in the thoracic region of the lower cervical spine. Dr. Kramer further noted that Plaintiff indicated the physical therapy aggravated her pain and caused increased discomfort. The MRI study of the cervical spine disclosed no significant disc

herniations and some mild degenerative changes at the C4-5 and C5-6 regions of the cervical spine. Dr. Kramer discontinued physical therapy and referred her to a pain management specialist for possible injections. (Pl.'s Ex. 3, ECF No. 36-3.)

From May 31, 2006 through July of 2006, Ms. Hampton was treated at Advanced Pain Management by Lloyd G. Lamperski, M.D. and Mark R. LoDico, M.D., pain management specialists. Plaintiff was first evaluated by Dr. Lamperski on May 31, 2006, at which time he diagnosed Plaintiff's condition as cervical spinal pain secondary to a discogenic syndrome versus facet arthropathy status post motor vehicle accident with component of myofascial pain. Plaintiff was given bilateral cervical facet nerve blocks on June 13, 2006 and left cervical facet rhizotomy on July 18, 2006. Despite the use of medications and nerve blocks, no significant relief of the Plaintiff's symptoms occurred. (Pl.'s Ex. 4, ECF No. 36-4.)

Plaintiff was evaluated by a neurologist, Richard B. Kasdan, M.D. on July 12, 2006, at the request of her attorney. At such time, Dr. Kasdan noted complaints of severe and persistent headaches with the existence of cervical and inter scapular pain. He noted that her symptoms had persisted despite a course of conservative treatment involving physical therapy, traction, medications, and nerve blocks, and that there were no abnormalities on her cervical or brain MRIs. He advised her to continue with her pain management course with Dr. LoDico and if that fails, to seek chiropractic care. (Pl.'s Ex. 5, ECF No. 36-5.)

Subsequently, Plaintiff sought follow-up treatment with Dr. Kramer on August 15, 2006, for her cervical pain. Plaintiff reported that she was unhappy with Dr. Lodico's office, and got no relief following the cervical facet blocks. Dr. Kramer noted that a recent neurological examination by Dr. Kasdan revealed no abnormalities. Physical examination revealed full active range of motion of the cervical spine and left shoulder without any signs of impingement, and some tenderness in the left

trapezium and over the superior angle of the scapula. Dr. Kramer referred her to another pain specialist for a pain evaluation, and provided her with Lidoderm patches to alleviate some of her superficial type of pain complaints. (Pl.'s Ex. 3, ECF No. 36-3.)

On August 28, 2006, Ms. Hampton was evaluated by Dr. Marc J Adelsheimer, a physical medicine and rehabilitation specialist, upon the referral of Dr. Kramer. Dr. Adelsheimer offered a diagnosis of cervical strain with ongoing muscle spasms and trigger points, with underlying mild degenerative disease and minimal radiculitis. His plan of treatment included an aggressive therapy program and a muscle relaxant, in addition to her current medications. He indicated that if she did not have a good response to that, he would recommend a course of epidural steroid injections to the cervical region of the spine. He also indicated she may be a candidate for some trigger point injections to help her get over the hump with therapy. (Pl.'s Ex. 6, ECF No. 36-6.)

Plaintiff saw Dr. Adelsheimer again on September 28, 2006, when he noted that she had not made any significant progress with therapy. His diagnosis continued to be cervical strain with ongoing muscle spasm and degenerative disc disease with minor radiculitis. He recommended a left C7-T1 intralaminar epidural steroid injection, continued her medications, and discontinued further therapy. Subsequently, Plaintiff underwent the first epidural steroid injection on October 24, 2006. Plaintiff reported some relief from the injection at her follow-up examination with Dr. Adelsheimer on November 9, 2006. Dr. Adelsheimer recommended a second left C7-T1 intralaminar epidural steroid injection. Dr. Adelsheimer saw Plaintiff again on November 21, 2006 after the second injection. Plaintiff reported some improvement, and Dr. Adelsheimer recommended a third injection to maximize the benefits. Dr. Adelsheimer saw Plaintiff on December 12, 2006 for a follow-up appointment after her third injection. He noted that the injections helped her a lot and she was feeling significantly better. She was still experiencing a lot of muscle tightness in her upper trapezius

and neck region. Dr. Adelsheimer administered a trigger point injection in the left upper trapezius region. He did not think any additional injections were necessary at that point, and recommended that Plaintiff continue with her home exercise program and follow up with him in three months. (*Id.*)

In October of 2006, GEICO requested a peer review of the medical treatment provided to Plaintiff to determine whether the medical treatment she was receiving was reasonable and necessary. (Dep. Tr. of Elaine Rensing 2/25/10 ("Rensing Dep. Tr.") at 14.) The peer review was randomly assigned to the Prime Network, one of three peer review organizations utilized by GEICO. (Rensing Dep. Tr. at 14-17.) The Prime Network assigned Plaintiff's case to Steven A. Feinstein, M.D. for peer review. Dr. Feinstein's October 21, 2006 report indicates that he reviewed the medical treatment provided by the following medical providers:

a. Thomas Kramer, M.D.;
b. Advanced Pain Medicine;
c. Richard Kasdan, M.D.;
d. Marc Adelsheimer, M.D.;
e. West Penn Allegheny Health System treatment notes and physical therapy notes;
f. Emergency department records University of Pittsburgh Medical Center, Shadyside Hospital;
g. Radiology records, University of Pittsburgh Medical Center;
h. Physical therapy notes, Human Motion Center;
i. Prescription for Rehabilicare;
k. Application for benefits;
I. Invoices from Allegheny General Hospital.

(Peer Review Report of Steven A. Feinstein, M.D. ("Feinstein Report"), Def.'s Ex. "C," ECF No. 30-3.) In addition, Dr. Feinstein stated in his report that he discussed Plaintiff's case with Dr. Ayers on October 20, 2006, and that the information Dr. Ayers provided during that telephone conference was taken into account in preparation of report. (Feinstein Rpt. at 4.) Plaintiff submits that Dr. Feinstein's statement in his report, that he discussed Plaintiff's case with Dr. Ayers, is false. (Pl.'s Concise Stmt. Mat. Facts at ¶13, ECF No. 36.) However, Plaintiff offers no evidence to support her

accusation.[2]

Dr. Feinstein concluded that Plaintiff sustained soft tissue injuries in the accident of February 17, 2006. (*Id.*) Dr. Feinstein further concluded that as of October 20, 2006, no follow-up visits with Dr. Ayers were necessary. (*Id.*) Dr. Feinstein opined that the referral by Dr. Ayers to Dr. Kramer for orthopedic treatment between March 7 and August 15, 2006 was appropriate and necessary, but orthopedic treatment beyond August 15, 2006 was not indicated. (*Id.*) Dr. Feinstein further concluded that Plaintiff should have achieved maximum medical improvement by the date of the report, October 21. 2006. (*Id.*)

Plaintiff timely requested a reconsideration of Dr. Feinstein's peer review. (Compl. at ¶14.) In January, 2007, a reconsideration was performed by an internal medicine specialist, Harold K. Gever, M.D., also with the Prime Network. (Compl. at ¶¶15-17.) In addition to those records previously reviewed by Dr. Feinstein, Dr. Gever reviewed additional records of Dr. Adelsheimer/Rehabilitation and Pain Specialists through December 12, 2006. Dr. Gever concluded that treatment provided by Dr. Adelsheimer through December 12, 2006 was medically necessary and reasonable and that Plaintiff had reached maximum medical improvement by December 12, 2006. (Report of Harold Gever, M.D. dated 1/11/07 ("Gever Report"), Def.'s Ex. "D," ECF No. 30-4.) Following receipt of the Dr. Gever's report dated January 11, 2007, GEICO notified Plaintiff's medical providers that it would not be considering payment of any of their medical bills for services rendered after December 12, 2006. (Correspondence between GEICO and various medical providers identified collectively as Def.'s

---

[2]Plaintiff cites to her Complaint generally, but this is not sufficient to create an issue of fact on summary judgment. *See* Fed.R.Civ.P. 56(e)(2). The record is devoid of any evidence to support Plaintiff's contention that Dr. Feinstein falsely stated in his report that he discussed Plaintiff's treatment with Dr. Ayers. Therefore, Plaintiff has failed to show a genuine issue of material fact exists with regard to Dr. Feinstein's statement in his report re: Dr. Ayers.

Ex. "F," ECF No. 30-6.)

Plaintiff contends that GEICO sought another reconsideration of Dr. Feinstein's peer review opinion, which was conducted by Dr. Richard S. Kaplan, a physiatrist associated with the Prime Network. (Pl.'s Concise Stmt. Mat. Facts, ¶16, ECF No. 36.)[3] However, Plaintiff does not cite to any evidence in the record that supports this statement. GEICO disputes that it requested reconsideration of Dr. Feinstein's peer review opinion, and attaches, in support, the affidavit of Jean Siwula, GEICO's claims examiner assigned to Plaintff's case, who reviewed the file and stated there was no indication that GEICO ordered a second reconsideration. (Def.'s Reply to Pl.'s Resp. to Def.'s Mot. for Summ. J. at 4, ECF No. 37, and Def.'s Ex. A thereto, ECF No. 37-1.)

GEICO contracted with The Prime Network to arrange for the initial peer review with Dr. Feinstein and the reconsideration with Dr. Gever. (Compl. at ¶¶11-16 and 22.) At all relevant times, GEICO contracted with several different peer review organizations which it would utilize to conduct peer reviews. (Rensing Dep. Tr. at 14-15.)[4] GEICO distributes its peer reviews evenly among the contracted peer review organizations and employs a "blind" rotational system in selecting a peer review organization in a particular case. (*Id.* at 14-18.) GEICO's claims examiner, Jean Siwula, stated that peer review of Plaintiff's case was randomly assigned to the Prime Network. (Affavit of Jean Siwula ("Siwula Aff."), Ex. A to Def.'s Reply Br., ECF No.

---

[3] According to Plaintiff, Dr. Kaplan opined on January 26, 2007 that none of the treatment rendered by Dr. Adelsheimer was reasonable or medically necessary or causally related to the injuries sustained in the subject accident. (*Id.*) However, Plaintiff does not attach a copy of Dr. Kaplan's report.

[4] Plaintiff contends that GEICO utilized five different PROs for peer review. However, Elaine Rensing's testimony, which Plaintiff cites, clearly states that GEICO utilized three different PROs. Subsequently, GEICO, in its Reply to Plaintiff's Response to its summary judgment motion, attached Jean Siwula's affidavit, wherein she states that the Prime Network was one of five PROs with whom GEICO contracted in August of 2006. Thus, it is unclear whether the actual number of PROs used by GEICO was three or

37-1.)  As such, GEICO exercised no control over which peer review vendor was selected to perform a particular peer review. (*Id.* at 14-15.)  With regard to Plaintiff's case, Elaine Rensing of GEICO testified that the reason that the reconsideration was conducted by the same PRO (Prime Network) as the initial peer review, is that it was GEICO's practice, in all cases, to send the reconsideration to the same vendor that conducted the initial peer review.  (Rensing Dep. Tr. at 30-31.)

In August of 2007, seven months after Dr. Gever determined that Plaintiff had reached maximum medical improvement by December 12, 2006, Ms. Hampton sought treatment from Joel Lopacinski, D.C., a chiropractor.   Beginning on August 13, 2007, Plaintiff received 11 visits of passive physical therapy (which included ultrasound) and 6 visits of thera band and exercise ball rehabilitation. On September 24, 2007, Plaintiff was transitioned into a Zinovieff protocol progressive resistance program for 12 scheduled treatments, of which she completed 9 as of the date of Dr. Lopacinski's report on October 16, 2007. Dr. Lopacinski reported that although she was still experiencing pain in the cervical/thoracic spine and left shoulder as of October 16, 2007, Plaintiff's pain was decreasing and she was able to sleep better and increase her activities.  He also noted that her complaint of headaches decreased from frequent to occasional, and her upper thoracic pain was improving.  Dr. Lopacinski reported that Plaintiff's prognosis was favorable, although he could not rule our residuals at that time.  (Pl.'s Ex. 7, ECF No. 36-7.)

Almost a year later, and two years after the initial peer review, Plaintiff's PCP referred her for a rheumatologic consultation with Noah S. Bass, M.D., on September 17, 2008.  Dr. Bass noted that Plaintiff has complained of pain in her neck and shoulders since the time of her

---

five, but this issue is not material to the outcome here.

accident on February 17, 2006 through the present time. After his examination which found tenderness over both subdeltoid bursal regions along the upper shoulder musculature on both sides along the lower and upper cervical spine regions posteriorly, at the second rib margin with the sternum on both sides, along either side of the thoracic and lumbar spines, and over both greater trochanteric bursal regions. Dr. Bass concluded that Plaintiff appeared to have a myofascial pain syndrome along with sleep disturbance, and noted 14 of 18 positive tender points recorded, which suggested an overall diagnosis of fibromyalgia. Dr. Bass's plan included obtaining current diagnostic tests (x-rays and lab work), and change in medications, and indicated that Plaintiff should schedule a follow-up visit in 4 weeks. (Pl.'s Ex. 8, ECF No. 36-8.) There is no indication in the summary judgment record that Plaintiff sought out any follow up treatment from Dr. Bass, or any other medical provider, after September 17, 2008.

On or about January 16, 2009, Plaintiff commenced the instant matter by filing a complaint in the Court of Common Pleas of Allegheny County, Pennsylvania. Subsequently, GEICO filed a timely notice of removal with this Court on the basis of diversity jurisdiction. After the close of discovery, GEICO moved for summary judgment. The motion has been fully briefed and responded to and thus is ripe for disposition.

**B.      Standard of Review**

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any

element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**C.**   **Discussion**

GEICO presents four issues in its pending summary judgment motion:   (1) Whether GEICO breached its insurance contract with Plaintiff when it discontinued payment of first party medical benefits based on the results of a peer review and a reconsideration, pursuant to §1797(b) of the Motor Vehicle Financial Responsibility Law ("MVFRL"); (2) whether Plaintiff can still pursue a bad faith claim where she has failed to prove breach of contract; (3) whether Plaintiff's bad faith claim is precluded by §1797 of the MVFRL, which provides the exclusive means for a plaintiff to seek redress for an insurer's denial of a first party benefits claim; and (4) whether GEICO's conduct constitutes merely nonfeasance, as opposed to misfeasance, and therefore the UTPCPL does not provide Plaintiff with a private cause of action. Each of these issues is addressed below.

### 1. Breach of Contract Claim

To succeed on her claim for breach of contract, Plaintiff must prove: "'(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" *Ware v. Rodale Press, Inc*., 322 F.3d 218, 225 (3d Cir.2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa.Super.Ct.1999)). Plaintiff's breach of contract claim rests on the premise that the initial peer review report and two subsequent reconsiderations reduced her first party medical benefits and resulted in medical treatment provided to her by licensed physicians and health care providers to go unpaid, which constitutes a breach of her contract for first party insurance benefits with GEICO. (Compl. ¶28.) Plaintiff further contends that GEICO's refusal to honor her claim for medical benefits unilaterally and without justification has caused her to become personally responsible for medical bills arising from her motor vehicle accident, in contradiction to the terms of her insurance policy with GEICO, as well as Pennsylvania statutory and decisional law, and that GEICO's failure to pay for her continued medical treatment for the injuries she sustained in the accident also constitutes a breach of her contract for first party insurance benefits. (*Id.* at ¶¶29-30.) In support of its summary judgment motion, GEICO submits that Plaintiff's breach of contract claim fails as a matter of law because Plaintiff cannot establish the second element—that it breached a duty imposed by the Policy when it discontinued payment of first party medical benefits.

The Pennsylvania Family Automobile Insurance Policy issued by GEICO ("Policy") to Plaintiff covering the subject accident provides in relevant part:

**PAYMENTS WE WILL MAKE**

> In accordance with the Pennsylvania Motor Vehicle Financial Responsibility Law, we will pay first party benefits for:

        (a)(1)   ***medical expenses,***
          (2)   ***income loss,*** and
          (3)   ***funeral expenses***

        arising from ***bodily injury*** to an ***eligible person*** resulting from the maintenance or use of a ***motor vehicle*** as a vehicle; . . .

Policy at 7-8 (Def.'s Ex. B, ECF No. 30-2). The Policy defines "***medical expenses***" as "reasonable and necessary charges" for:

        (a)      medical treatment, including but not limited to:

              (1)  medical, hospital, surgical, nursing and dental services;
              (2)  medications, medical supplies and prosthetic devices; and
              (3)  ambulance;

        (b)      medical and rehabilitative services, including but not limited to:

              (1)  medical care;
              (2)  licensed physical therapy, vocational rehabilitation and occupational therapy;
              (3)  osteopathic, chiropractic, psychiatric and psychological services; and
              (4)  optometric services, speech pathology and audiology;

        . . .

        All medical treatment and medical and rehabilitative services must be provided by or prescribed by a person or facility approved by the Department of Health, the equivalent governmental agency responsible for health programs or the accrediting designee of a department or agency of the state in which those services are provided.

        . . .

Policy at 7.

     The Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa.

Cons. Stat. Ann. §1701 *et seq.*, which is incorporated by reference in the Policy, defines

"necessary medical treatment and rehabilitative services" as "Treatment, accommodations,

products or services which are determined to be necessary by a licensed health care provider

unless they shall have been found or determined to be unnecessary by a State approved peer

review organization (PRO)."  75 Pa. Cons. Stat. Ann. §1702.   Section 1797(b), entitled "Peer

Review Plan for Challenges to Reasonableness and Necessity of Treatment," provides in relevant

part:

> **(1) Peer review plan**.--Insurers shall contract jointly or separately with any peer review organization established for the purpose of evaluating treatment, health care services, products or accommodations provided to any injured person. Such evaluation shall be for the purpose of confirming that such treatment, products, services or accommodations conform to the professional standards of performance and are medically necessary. An insurer's challenge must be made to a PRO within 90 days of the insurer's receipt of the provider's bill for treatment or services or may be made at any time for continuing treatment or services.

> **(2) PRO reconsideration**.--An insurer, provider or insured may request a reconsideration by the PRO of the PRO's initial determination. Such a request for reconsideration must be made within 30 days of the PRO's initial determination. If reconsideration is requested for the services of a physician or other licensed health care professional, then the reviewing individual must be, or the reviewing panel must include, an individual in the same specialty as the individual subject to review.

> **(3) Pending determinations by PRO**.--If the insurer challenges within 30 days of receipt of a bill for medical treatment or rehabilitative services, the insurer need not pay the provider subject to the challenge until a determination has been made by the PRO. The insured may not be billed for any treatment, accommodations, products or services during the peer review process.

> . . .

**(7) Determination in favor of insurer**.--If it is determined by a PRO or court that a provider has provided unnecessary medical treatment or rehabilitative services or merchandise or that future provision of such treatment, services or merchandise will be unnecessary, or both, the provider may not collect payment for the medically unnecessary treatment, services or merchandise. If the provider has collected such payment, it must return the amount paid plus interest at 12% per year within 30 days. In no case does the failure of the provider to return the payment obligate the insured to assume responsibility for payment for the treatment, services or merchandise.

75 Pa. Cons. Stat. Ann. §1797(b)(1), (2), (3) & (7).

Based on the above provisions of the MVFRL, GEICO submits that it was entitled to rely upon the results of the peer review and reconsideration in making its decision to discontinue payment of first party benefits, and it is undisputed that it did, in fact, rely upon those reports in making its decision to discontinue payment for Plaintiff's medical treatment after December 16, 2006. In addition, GEICO submits that although §1797(b) allows an insured to challenge the denial of benefits in court, Plaintiff has failed to meet her burden of proof inasmuch as she has adduced no evidence in the form of expert reports or otherwise which would contradict the findings of the peer review or reconsideration. Thus, GEICO contends that Plaintiff's breach of contract claim should be dismissed with prejudice.

In opposing summary judgment, Plaintiff does not address GEICO's argument, but instead, argues that an "unreasonable act," defined for purposes of the MVFRL as "one that the actor objectively should not have made, but it is not necessarily one made in 'bad faith[,]'" can be found by a jury as constituting a breach of the insurance contract between an insured and insurer. Plaintiff submits that evidence of such a breach exists here in that GEICO's use of the same entity to perform all requested peer reviews constituted an unreasonable act, which was a

breach of the insurance contract between them. However, Plaintiff fails to cite to any authority that supports her theory that using the same entity to perform all of the peer reviews was an unreasonable act.[5] Nothing in the MVFRL or case law prohibits such practice.

Clearly, the Policy requires GEICO to pay for all reasonable and necessary medical expenses, and by incorporation of the MVFRL, such payment continues unless the medical treatment and rehabilitative services are determined to be unnecessary by a state approved PRO. Moreover, it is undisputed that GEICO (1) had been paying Plaintiff's medical expenses since the time of her accident in February 2006;, (2) requested a peer review in October 2006, which was randomly assigned to the Prime Network; and (3) discontinued payment only after it received the results of the peer review and reconsideration, which determined that medical treatment was no longer necessary after December 16, 2006. As GEICO has acted in compliance with both the Policy and MVFRL, Plaintiff cannot establish, as a matter of law, that GEICO breached its duty to pay first party benefits to her.

To avoid summary judgment, Plaintiff further argues that at the very least, a genuine issue of fact exists that would preclude entry of summary judgment in GEICO's favor. However, she fails to identify the specific evidence in the record that creates a material issue of fact as to GEICO's alleged breach of its duty to pay first party benefits, nor could the court find

---

[5] Plaintiff's reliance on *Danley v. State Farm Mutual Automobile Insurance Co.,* 808 F.Supp. 399 (M.D.Pa. 1992), is misplaced. In that case, the issue before the court was whether the insured seeking first party wage-loss benefits as a result of an automobile accident may claim punitive damages against the insurer under §8371. In resolving whether there was a conflict between §1716 of the MVFRL and §8371, the court distinguished the provision under §1716, that the insurer shall be liable for attorneys fees if it is found that the insurer acted in an unreasonable manner in refusing to pay benefits when due, from "bad faith conduct" under §8371, and concluded that "unreasonable conduct" under §1716 and "bad faith conduct" under §8371 were not the same. 808 F.Supp. at 402. Nowhere in that case does the district court discuss, let alone hold, that an insurer acts unreasonably when it uses the same PRO to perform the initial peer review and reconsiderations, or when it discontinues payment of first party benefits based on a

any upon its own examination of the record. Accordingly, because no reasonable jury could conclude that GEICO breached its insurance contract with Plaintiff, the Court finds that GEICO is entitled to summary judgment in its favor on Plaintiff's breach of contract claim.

### 2. Bad Faith Claim

GEICO has also moved for summary judgment on Plaintiff's statutory bad faith claim. In Pennsylvania, a private cause of action exists for bad faith conduct of insurers pursuant to 42 Pa. Cons. Stat. Ann. §8371, which provides, in relevant part:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

"Bad faith" is not defined in the statute, however, courts interpreting Pennsylvania law have held that a §8371 claim contains two elements: (1) the insurer lacked a reasonable basis for denying benefits under the applicable policy, and (2) the insurer knew or recklessly disregarded the lack of a reasonable basis for refusing the claim. *Employers Mut. Cas. Co. v. Loos,* 476 F.Supp. 2d 478, 490 (W.D.Pa. 2007) (citing *Terletsky v. Prudential Prop.,* 649 A.2d 680, 688 (Pa. Super. Ct. 1994)); *see also Horowitz v. Fed. Kemper Life Assur. Co.,* 57 F.3d 300, 307-08 (3d Cir. 1995) (citing *D'Ambrosio v. Pa. Nat'l Mut. Cas. Ins. Co.,* 431 A.2d 966, 971 (Pa. 1981)). The level of culpability required to prove bad faith is something more than mere

---

peer review report.

negligent conduct which is harmful to the insured. *Loos,* 476 F.Supp. 2d at 490 (citing *Brown v. Progressive Ins. Co.,* 860 A.2d 493, 501 (Pa. Super. Ct. 2004)). The superior court expounded on this point in *O'Donnell ex rel. Mitro v. Allstate Insurance Co.*:

> [O]ur Court has adopted the following definition of "bad faith" as applicable in the context of insurance:
>
>> "Bad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

734 A.2d 901, 905 (Pa. Super. Ct. 1999) (citing *Romano v. Nationwide Mut. Fire Ins. Co.*, 646 A.2d 1228, 1232 (Pa. Super. Ct. 1994) (quoting *Black's Law Dictionary* 139 (6th ed. 1990))) (other citation omitted). Considerations of "the motive or self-interest or ill will" of the insurer are not a third element of a bad faith claim, but rather, are probative of the second element enumerated in *Terletsky, i.e.*, "'the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim.'" *Loos,* 476 F.Supp. 2d at 491 (quoting *Terletsky*, 649 A.2d at 688).

The standard of proof required to establish a statutory bad faith claim against an insurer under Pennsylvania law is clear and convincing evidence. *Loos,* 476 F.Supp. 2d at 491 (citing *Terletsky,* 649 A.2d at 688) (footnote omitted); *Nw. Mut. Life Ins. Co. v. Babayan,* 430 F.3d 121, 137 (3d Cir. 2005) (citing *Terletsky, supra*). "The 'clear and convincing' standard requires that the plaintiff show 'that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith.'" *J.C. Penney Life Ins. Co. v. Pilosi,* 393 F.3d 356, 367 (3d Cir. 2004) (quoting *Bostick v. ITT*

*Hartford Group, Inc.*, 56 F.Supp.2d 580, 587 (E.D.Pa.1999)). Accordingly, GEICO's summary judgment motion as to Plaintiff's bad faith claim must be evaluated with the clear and convincing evidence standard in mind. *Id.* at 492; *Babayan,* 430 F.3d at 137 (noting that "the insured's burden in opposing a summary judgment motion brought by the insurer is 'commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial.'") (quoting *Kosierowski v. Allstate Ins. Co*., 51 F.Supp.2d 583, 588 (E.D.Pa.1999)).

In the case at bar, the gravamen of Plaintiff's §8371 bad faith claim is that GEICO engaged in bad faith conduct by repeatedly selecting the Prime Network, which had a financial interest in providing biased reviews, as the PRO to review Plaintiff's medical treatment, knowing that the Prime Network was biased in GEICO's favor. (Compl. ¶¶45-46, 49-51.) In addition, Plaintiff contends that GEICO acted in bad faith by utilizing the peer review process to determine the causal connection between the accident and Plaintiff's injuries, which is beyond the scope of §1797 (Compl. ¶¶ 48, 52), as well as by denying payment of first party medical benefits without any reasonable basis, knowing or recklessly disregarding its lack of a reasonable basis to deny benefits (Compl. ¶47).

GEICO seeks summary judgment on Plaintiff's bad faith claim on two grounds. First, GEICO argues that some authority exists which supports the proposition that because Plaintiff has failed to establish that GEICO breached its insurance contract with her, there can be no claim for bad faith. Plaintiff has failed to respond to this argument. GEICO acknowledges that the case law is not settled on this point. On the one hand, GEICO cites *March v. Paradise Mutual Insurance Co.,* in which the Pennsylvania Superior Court affirmed the dismissal of the

underlying breach of contract claim on statute of limitations grounds, but allowed the bad faith claim to proceed. 646 A.2d 1254, 1256-57 (Pa. Super. Ct. 1994). In concluding that the §8371 bad faith claim was not barred by the one-year statute of limitations, the superior court opined:

> As this court has found that claims under section 8371 are separate and distinct causes of action and as the language of section 8371 does not indicate that success on the contract claim is a prerequisite to success on the bad faith claim, we find that an insured's claim for bad faith brought pursuant to section 8371 is independent of the resolution of the underlying contract claim. . . . [A]s [the insured]'s bad faith claim brought under 42 Pa.C.S. § 8371 is independent of her contract claim, the bad faith claim is not affected by the one-year limitations period in the insurance contract.

*Id.* (footnote omitted).

On the other hand, GEICO cites *Messina v. Liberty Mutual Insurance Co.,* Civ. A. No. 95-7093, 1996 WL 368991 (E.D.Pa. July 1, 1996), in which the district court distinguished the holding in *March* based on the fact that the underlying breach of contract claim was not decided on the merits, but dismissed on statute of limitations grounds. In this regard, the *Messina* court observed:

> In *March*, a procedural defect, the expiration of a limitations period, led to the lower court's dismissal of the underlying contract claim. The *March* court did not have occasion to consider the merits of the contract claim. Thus, the *March* court's conclusions regarding the independence of the insured's § 8371 claim merely establish that failure of a claim for coverage does not render the accompanying bad faith claim invalid *per se.*

*Id.* at *4. Unlike the contract claim in *March,* the insured's contract claim in *Messina* was not dismissed for procedural reasons, but rather, because the arbiters made a substantive determination that there was no coverage under the policy. *Id.* Thus, to the extent the insured's

bad faith claim was predicated upon a denial of coverage, the *Messina* court found that the bad faith claim was precluded by the determination on the merits of the insured's contract claim. *Id.* However, the court in *Messina* went on to find that the insured's complaint also alleged bad faith by the insurer in delaying to submit her coverage dispute to arbitration, and that such conduct may fall within the purview of §8371.[6] The court reasoned that "[u]nlike the duty to pay benefits, an insurer's duty to arbitrate does not depend on whether coverage exists under the policy. Thus, the failure of [the insured]'s coverage claim would not prevent her from recovering for a bad faith refusal to arbitrate on the part of [the insurer]." *Id.* at *4 n. 5.

Finally, GEICO cites *Pizzini v. American International Specialty Lines Insurance Co.,* 249 F.Supp. 2d 569 (E.D.Pa. 2003), for the proposition that where an insurer prevails on a breach of contract claim, there can be no claim for bad faith. In *Pizzini,* the district court granted summary judgment in favor of the insurer on the insured's §8371 bad faith claim for refusing to indemnify its insured. *Id.* at 570. In so doing, the *Pizzini* court explained:

> "[B]ad faith claims cannot survive a determination that there was no duty to defend, because the court's determination that there was no potential coverage means that the insurer had good cause to refuse to defend." [*Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.,* 193 F.3d 742, 751 n. 9 (3d Cir. 1999)]. It follows that an insurer with no duty to defend or indemnify its insured could not have acted in bad faith in violation of § 8371.

*Id.* at 570-71 (other citations omitted). The holding in *Pizzini* is distinguishable from *March* because unlike the breach of contract claim in *March,* the underlying breach of contract claim in *Pizzini* was decided on the merits, and the §8371 bad faith claim was contingent upon the success of the underlying breach of contract claim. 249 F.Supp. 2d at 570 (citing *Frog, Switch &*

---

[6] The *Messina* court declined to rule on whether this conduct actually fell within the purview of §8371 because neither party had briefed the issue, and the court determined that the parties should be allowed

*Mfg. Co.,* 193 F.3d at 751 n. 9). Indeed, the *Pizzini* court noted that a bad faith claim could survive the dismissal of a breach of contract claim only in rare circumstances, such as where a procedural defect bars the breach of contract claim. *Id.* at 570 n. 1 (citation omitted).

The decisions in *Messina* and *Pizzini* are not necessarily inconsistent. It is clear from the court's discussion in *Pizzini* that the §8371 bad faith claim was contingent on the underlying breach of contract claim for denial of coverage. However, in *Messina,* the insured had alleged bad faith conduct that was not contingent upon whether coverage existed under the policy. Thus, like *Messina* and *Pizzini,* the question this Court must decide is whether Plaintiff's statutory bad faith claim is contingent upon her breach of contract claim for terminating her benefits.

To the extent Plaintiff's bad faith claim is predicated upon the denial of first party benefits without any reasonable basis, it is foreclosed by this Court's ruling earlier that Plaintiff failed to establish that GEICO breached its duty of care to Plaintiff in terminating payment for first party medical benefits. However, Plaintiff has also alleged bad faith conduct by GEICO which does not appear to be contingent upon this court's ruling on the breach of contract claim. In this regard, Plaintiff contends GEICO repeatedly selected a PRO with a financial interest in providing biased reviews to review Plaintiff's medical treatment, knowing that the PRO was biased in GEICO's favor, and with the improper purpose of determining the causal connection between the accident and Plaintiff's injuries. These allegations appear to be beyond the scope of §1797, and substantial authority exists which supports the proposition that such bad faith conduct, if proven, would be subject to the remedies available under §8371. *See, e.g., Schwartz v. State Farm Ins. Co.,* Civ. A. No. 96-160, 1996 WL 189839, at *4 (E.D.Pa. Apr. 18, 1996);

the opportunity to brief the issue. *Id.* at *5.     22

*Perkins v. State Farm Ins. Co.,* 589 F.Supp.2d 559, 564-65 & n. 3 (M.D.Pa. 2008) (listing cases holding that insured may raise §8371 claim based on allegations of bad faith conduct by insurer which go beyond the scope of §1797(b)*; see also* discussion *infra* at 24-26. Thus, the Court cannot find, as a matter of law, that its ruling on Plaintiff's breach of contract claim forecloses her bad faith claim.

The second ground upon which GEICO seeks summary judgment on Plaintiff's bad faith claim, and to which Plaintiff fails to respond, is its argument that Plaintiff's bad faith claim is precluded by §1797 of the MVFRL, which provides the exclusive means for a plaintiff to seek redress for an insurer's denial of a first party benefits claim. GEICO cites a number of federal and state court cases in support of this proposition. The decisions in these cases are premised on the finding that the §1797(b) and §8371 are in irreconcilable conflict, based on Pennsylvania law on statutory construction,[7] as the damages in the event of wanton or bad faith conduct and the rates of interest specified in each provision are different, and the procedures and remedies under §1797 are stated with specificity. *Barnum v. State Farm Mut. Auto. Ins. Co.,* 635 A.2d 155, 158 (Pa. Super. Ct. 1993), *rev'd in part on other grounds* 652 A.2d 1319 (Pa. 1994). Therefore, because the two provisions were enacted at the same time and could not be reconciled, the superior court held that the specific provisions of §1797 must be deemed an exception to the general remedy for bad faith contained in §8371. *Id.* at 159. Subsequently, in *Gemini Physical Therapy & Rehabilitation, Inc. v. State Farm Mutual Automobile Insurance Co.,* 40 F.3d 63, 67 (3d Cir. 1994), the court of appeals, in affirming the district court's dismissal of the insured's §8371 claim on the basis that §1797 provides the exclusive first party remedy for bad faith

---

[7] 1 Pa. Cons. Stat. §1933.

denials by insurers regarding claims for injuries caused by automobile accidents, found the superior court's statutory construction in *Burnam* to be convincing and predicted that the Pennsylvania Supreme Court would rule similarly on this matter.

Although the superior court's decision in *Barnum* was reversed after the court of appeals decision in *Gemini*, that reversal does not necessarily call into doubt the *Gemini* court's holding, as the reversal in *Barnum* only pertained to the issue of whether an insured was required to request reconsideration under §1797 before proceeding to court, based on its recently decided opinion in *Terminato v. Pennsylvania National Insurance Co.,* 645 A.2d 1287 (Pa. 1994). In addition, the Ge*mini* court was clearly cognizant of any impact the supreme court's recent decision in *Terminato* might have had on *Burnam*, as the *Gemini* court acknowledged the supreme court's recent *Terminato* decision. *Gemini,* 40 F.3d at 65. Moreover, as Judge Rendell explained in *Schwartz,* 1996 WL 189839, *4 n. 3, in her thorough and well-reasoned opinion, the superior court's analysis of the relationship between §8371 and §1797 in *Burnam* was clearly independent of its reliance on the superior court's holding in *Terminato* regarding whether an insured was required to request reconsideration under §1797 before proceeding to court. Thus, Judge Rendell found that the *Barnum* court's statutory analysis of §8371 and the MVFRL remained controlling precedent and was consistent with the conclusion that plaintiff's claim under §8371 in that case was not preempted by §1797. *Id.*

The holding of the *Gemini* court is limited though to those situations where the insured is asserting a denial of first party benefits that was made following the process outlined in §1797. *Id.* at *4 (citing a list of district court cases to so hold). Where, however, an insured claims bad faith on the part of the insurer for failure to follow the procedure outlined in §1797, or for abuse

of that process, a many courts have held that a bad faith claim can be asserted under §8371.  *See id.* (insured alleged insurer used a favored PRO, abuse of the peer review process by insurer generally and by PRO specifically  in opining as to causation, not merely the appropriateness of treatment).  *See also Perkins,* 589 F.Supp.2d at 564-65 & n. 3 (listing cases holding that insured may raise §8371 claim based on allegations of bad faith conduct by insurer which goes beyond the scope of §1797(b), and noting that many of these decision relied heavily on the opinion of Judge Rendell in *Schwartz*); *Johnson v. Northland Ins. Co.,* Civ. A. No. 05CV927, 2005 WL 3488712, *3 (W.D.Pa. Dec. 21, 2005) (denying motion to dismiss bad faith claim where plaintiff alleged the peer review process under §1797(b) was not followed) (citing *Schwartz,* 1996 WL 189839, at *4).  Indeed, Judge Rendell opined in *Schwartz* that "[n]othing in *Barnum* or *Gemini* suggests that a bad faith insurance coverage claim under §8371 is barred by §1797 where the peer review process set out in §1797, namely to determine the propriety of treatment and charges therefore, is not actually followed."  1996 WL 189839, at *4.

In *Dougherty v. State Farm Mutual Automobile Insurance Co.,* the district court explained under what circumstances §1797 will not operate as a bar to the remedies under §8371:

> § 1797 is generally the exclusive means to challenge denial of first party benefits where the insurer utilized a proper PRO for its intended limited purpose, to confirm that "treatment, products, services or accommodations conform to the professional standards of performance and are medically necessary." § 1797(b). In such cases, punitive damages and other remedies under § 8371 are unavailable. *Gringeri*, 1998 U.S. Dist. Lexis 5931, at *11. The statutory scheme of MVFRL, which contains its own procedures, remedies and penalties supports this reading. For example, where an insurer has failed to submit a PRO and the denial of benefits is "wanton," the statute allows treble damages. *See* § 1797(b)(4). Where, however, a PRO is utilized for purposes other than as

> specified under § 1797(b) or the PRO process itself is a sham, then the general claim of bad faith under § 8371 may go forward. *See Schwartz v. State Farm Ins. Co.*, Civ. A. No. 96-160, 1996 WL 189839, at *4-5 (E.D.Pa. Apr.18 1996); *Bacstrom v. State Farm Ins. Co.*, 40 Pa. D. & C. 4th 330, 338 (1998). In *Schwartz*, the plaintiff alleged that defendant State Farm had improperly used the PRO, not for its intended purpose as specified under § 1797(b) to determine whether the treatment was reasonable and necessary. 1996 WL 189839, at *4-5. Where a PRO process was improperly used, such as to determine causation, the court held that a bad faith claim under § 8371 was permissible. *Id.* at *5. In *Bacstrom*, the plaintiff alleged that the PRO itself was a sham and that State Farm used a captive reviewer who had a financial interest in providing State Farm with biased reviews. 40 Pa. D. & C. 4th at 338. As such, the court allowed the bad faith claim to go forward. *Id.*

*Dougherty,* Civ. A. No. 00-4734, 2002 WL 442107, at *4-5 (E.D.Pa. Feb. 7, 2002).

Like the district court in *Perkins,* this Court finds persuasive the reasoning of Judge Rendell in *Schwartz* and the expanding number of cases that have reached similar conclusions, and therefore, will apply the reasoning in those cases to the instant matter. As discussed *supra*, Plaintiff contends GEICO repeatedly selected a PRO with a financial interest in providing biased reviews to review Plaintiff's medical treatment, knowing that the PRO was biased in GEICO's favor, and with the improper purpose of determining the causal connection between the accident and Plaintiff's injuries. These allegations are beyond the scope of §1797, as they implicate GEICO's abuse of the procedure set forth in §1797(b), and almost identical to the examples of bad faith conduct discussed in *Dougherty*, which gave rise to a §8371 claim. Accordingly, the Court finds that Plaintiff's §8371 bad faith claim is not preempted by §1797, to the extent that she asserts bad faith conduct beyond the scope of §1797(b).

Although the Court has held that Plaintiff's statutory bad faith claim is not precluded by

the Court's grant of summary judgment on the breach of contract claim, or preempted by the MVFRL, the Court nonetheless finds GEICO is entitled to summary judgment on Plaintiff's bad faith claim. Plaintiff has failed to provide any evidence that GEICO's referral of her claim to the Prime Network was sufficiently outside the scope of §1797 to maintain a §8371 bad faith claim. Specifically, Plaintiff offers no evidence to support her allegations that (1) Prime Network had a financial incentive to provide a biased determination, (2) Prime Network continuously provided negative peer review reports to GEICO and other insurers, (3) that GEICO and Prime Network were too closely associated for Prime Network to render an objective evaluation, (4) Prime Network had a preconceived notion regarding first party benefits, (5) GEICO collaborated with Prime Network because of Prime Network's preconceived notion, or (6) GEICO utilized the peer review process to determine the causal connection between the accident and Plaintiff's injuries. Rather, Plaintiff relied entirely on the allegations in her complaint, which completely lack any supporting evidence.

On the other hand, GEICO has presented the deposition testimony of its employee, Elaine Rensing, who testified that GEICO contracted with several PROs to conduct peer reviews, that the peer reviews are distributed evenly among the contracted PROs and assigned randomly. (Rensing Dep. Tr. at 14-18.) Rensing further testified that the reason that the reconsideration was also conducted by Prime Network is that it was GEICO's practice, in all cases, to send the reconsideration to the same PRO that conducted the initial peer review. (*Id.* at 30-31.) GEICO also presented the affidavit of the claims examiner assigned to Plaintiff's case, Jean Siwula, who stated that the peer review of Plaintiff's case was randomly assigned to Prime Network, and that the peer review of Plaintiff's treatment was only the seventh time GEICO used the Prime

Network to conduct a peer review. (Siwula Aff.) GEICO also presented the peer review report and reconsideration report from the Prime Network physicians, Doctors Feinstein and Gever. Nowhere in either report do the physicians opine regarding the causal connection between the accident and Plaintiff's injuries. GEICO's evidence stands entirely uncontroverted.

To withstand summary judgment, the opposing party "must raise more than a mere scintilla of evidence in its favor and may not merely rely on unsupported assertions, conclusory allegations or mere suspicions." *Gringeri v. Maryland Cas. Co.,* Civ. A. No. 97-7373, 1998 WL 212762, at *5 (E.D.Pa. Apr. 29, 1998) (citing *Penchishen v. Stroh Brewery Co.,* 932 F.Supp. 671, 673 (E.D.Pa. 1996)). As the Supreme Court opined in *Celotex*:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

477 U.S. at 322-23. Here, Plaintiff bears the burden of proving GEICO's referral of Plaintiff's claim to the Prime Network was done in sufficient bad faith to sustain a claim under §8371. This she has utterly failed to do. Accordingly, Plaintiff's statutory bad faith claim fails as a matter of law. Therefore, the Court recommends that summary judgment be entered in favor of GEICO on Plaintiff's bad faith claim.[8]

---

[8] Rather than responding to GEICO's arguments in seeking summary judgment on the bad faith claim, Plaintiff submits a different argument altogether in opposing summary judgment. She advances the argument that GEICO violated its duty to act in good faith in rejecting her claim without good cause and

### 3. UTPCPL Claim

Finally, GEICO requests that the Court enter summary judgment in its favor on Plaintiff's UTPCPL claim. The purpose of the UTPCPL is to protect consumers from "fraud and unfair or deceptive business practices." *Commw. ex rel. Corbett v. Peoples Benefit Servs., Inc.,* 923 A.2d 1230, 1236 (Pa.Commw. Ct. 2007) (citing *Commw. ex rel. Creamer  v. Monumental Prop., Inc.,* 329 A.2d 812 (Pa. 1974)); *Gardner v. State Farm Fire & Cas. Co.,* 544 F.3d 553, 564 (3d Cir. 2008) (citing *Pirozzi v. Penske Olds-Cadillac-GMC, Inc.,* 605 A.2d 373, 375 (Pa. Super. Ct. 1992)). Moreover, the Pennsylvania Supreme Court has emphasized that the underlying foundation of the UTPCPL is fraud prevention and, as such, it is to be liberally construed to effect that purpose. *Creamer,* 329 A.2d at 816-17. The Pennsylvania Legislature included in the UTPCPL a private right of action for "[a]ny person who purchases . . . goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by [73 P.S. § 201-3] . . .." 73 P.S. § 201-9.2(a). Pursuant to the UTPCPL, "unlawful acts or practices" are defined as "[u]nfair methods of

---

in using the Prime Network to perform the peer reviews and, in any event, submits that a material issue of fact exists as to whether GEICO's actions were reasonable. Again, Plaintiff has failed put forth any evidence, let alone clear and convincing evidence, that GEICO acted in bad faith when it terminating her first party medical benefits under the Policy without a reasonable basis. It is undisputed that GEICO requested peer review of Plaintiff's medical treatment, as it was entitled to do under the Pa. MVFRL, and that in reliance on the reports issued by the peer review physicians, it refused to pay for any further medical treatment of Plaintiff after December of 2006. GEICO has produced evidence to show that the physicians conducting the initial peer review and reconsideration both concluded, within a reasonable degree of medical certainty, that continued medical treatment was neither reasonable nor necessary, as of December of 2006. On the other hand, Plaintiff has failed to present a report from any of her treating physicians that questions the conclusions reached by the peer review physicians or offers an opinion within a reasonable degree of medical certainty that additional medical treatment is reasonable and necessary. As Defendant's evidence stands uncontroverted, Plaintiff has failed to establish a material issue of fact as to the whether GEICO's reliance on the peer review reports to discontinue payment of first party medical benefits after December of 2006 was unreasonable.

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of [73 P.S. § 201-2(4)] . . ..." 73 P.S. § 201-3.[9]

In claims involving insurance policies, the court of appeals has explained that "'[i]n Pennsylvania, only malfeasance, the improper performance of a contractual obligation, raises a cause of action under the [UTPCPL], and an insurer's mere refusal to pay a claim which constitutes nonfeasance, the failure to perform a contractual duty, is not actionable.'" *Gardner,* 544 F.3d at 564 (quoting *Horowitz,* 57 F.3d at 307 (citing *Gordon v. Pa. Blue Shield,* 548 A.2d 600, 604 (Pa. Super. Ct. 1988)). With these legal precepts in mind, the Court turns now to the parties' arguments.

GEICO's argument is two-fold: (1) authority exists to support the proposition that the UTPCPL does not allow for a private cause of action; and (2), even if a private cause of action does exist under the UTPCPL, Plaintiff's claim, in essence, is based upon a failure to pay benefits under an insurance policy, which constitutes an act of nonfeasance, and only acts of misfeasance give rise to a private cause of action under the UTPCPL. In addition, GEICO submits that Plaintiff has failed to set forth specific evidence of record which supports her claim.

Turning to GEICO's first argument, the Court finds it is completely devoid of merit. The district court cases cited by GEICO on this issue are not controlling and were decided prior to the U.S. Court of Appeals' decisions in *Horowitz* and *Gardner,* both of which hold that the UTPCPL does provide a private cause of action against an insurer for acts of misfeasance. Accordingly, controlling precedential authority in this circuit requires the Court to reject GEICO's first argument outright.

---

[9] It is unclear from Plaintiff's Complaint and her brief in opposition to Defendant's motion for summary judgment as to which particular subsection(s) of Section 201-2(4) were allegedly violated by GEICO.

As to GEICO's second argument,[10] while Plaintiff concedes that an insurer's mere refusal to pay a claim constitutes nonfeasance and is not actionable under the UTPCPL, she argues nonetheless that she has alleged acts on the part of GEICO, other than the failure to perform a contractual duty, which give rise to misfeasance. In this regard, Plaintiff submits that she has *alleged* that GEICO "intentionally submitted her medical bills and treatment to a biased PRO knowing that it would receive a determination as to the reasonableness and necessity of treatment which would allow it to deny her claims. Such an allegation can establishes (sic) GEICO's improper performance is sufficient to state the type of malfeasance prohibited by the [UTP]CPL." (Pl.'s Br. in Resp. at 25, ECF No. 35.) Plaintiff further submits that "the Prime Network had a pecuniary interest in rendering peer review reports for the GEICO which limit or terminate first party medical benefits agreed to be provided by GEICO as soon as possible, even if the medical evidence is to the contrary." (*Id.*) Plaintiff also claims that GEICO possessed a financial incentive to limit first party benefits by utilizing a biased reviewer, the Prime Network, to deny those benefits, which constitutes a violation of the Pennsylvania UTPCPL. GEICO contends that Plaintiff's UTPCPL claim, at bottom, is a case based upon failure to pay benefits under an insurance policy, and, in any event, there is no evidence which suggests active

---

[10] The cases cited by GEICO do not support its position. In *Hardy v. Pennock Insurance Agency, Inc.,* 529 A.2d 471, 479 (Pa. Super. Ct. 1987), the issue was whether Unfair Insurance Practices Act ("UIPA"), under which penalties are properly enforced by the Insurance Commissioner, represented the sole and exclusive source of statutory redress of alleged unfair or deceptive acts of insurers and their agents, and thus, precluded a claim under the UPTCPL against an insurance agency, which the court answered in the negative. In *Elliott v. State Farm Mutual Automobile Insurance Co.,* 786 F.Supp. 487, 492 (E.D.Pa. 1992), the court found that plaintiff's allegations that the insurer concealed material information, had a contingency fee arrangement with a PRO, and misrepresented terms and conditions of the insurance contract, were not precluded by the UIPA. In so holding, the court in *Elliott* relied upon *Brownell v. State Farm Mutual Insurance Co.,* 757 F.Supp. 526, 531-32 (E.D.Pa. 1991), and *Chamberlain v. State Farm Mutual Automobile Insurance Co.,* Civ. A. No. 90-7070, 1991 WL 108688, *6 (E.D.Pa. June 13, 1991), both of which held that the UIPA did not preclude a UTPCPL claim against an insurer.

misfeasance on its part.

It appears that some authority exists for finding that the alleged actions of GEICO may constitute misfeasance for purposes of the UTPCPL. For example, in *Brownell,* a case actually cited by GEICO, the district court noted that while the refusal of the insurer to pay benefits to which the insured felt entitled is mere nonfeasance and not actionable under the UTPCLP, allegations that the insurer undertook an affirmative course of action to defraud the insured of benefits to which she was entitled, and misrepresented to her that medical coverage was available for injuries resulting from motor vehicle accidents without limitation for treatment of "soft tissue" injuries, were sufficient to withstand a motion to dismiss. 757 F.Supp. at 532-33. The district court in *Chamberlain,* like the district court in *Brownell*, denied the insurer's motion to dismiss plaintiff's UTPCPL claim, finding that allegations that the insurer affirmatively misrepresented material information concerning benefits under the policy with the intent of inducing the insured's reliance sufficiently stated acts of misfeasance to withstand a motion to dismiss. 1991 WL 108688 at *3. Similarly, in *Lites v. Great Am. Ins. Co.,* Civ. A. No. 00-CV-525, 2000 WL 875698, at *3-5 (E.D.Pa. June 23, 2000), a case cited by Plaintiff, the district court denied the insurer's motion to dismiss the insured's UTPCPL claim, finding that allegations of misfeasance went beyond nonfeasance,[11] and thus, were sufficient to survive the motion to dismiss.

The decisions in *Brownell, Chamberlain,* and *Lites* are distinguishable, however, from the case at bar in one important respect—all involved a motion to dismiss, as opposed to a

---

[11] The allegations of misfeasance in *Lites* included, *inter alia,* that the insurer "had no reasonable basis upon which to deny the UM claim, acted in a manner that was 'frivolous, motivated by self interest, and ill will,' [and] failed to procure the services of a physician to conduct an independent medical examination, . . .." 2000 WL 875698, at * 5.

motion for summary judgment, the latter of which requires the party opposing summary judgment to point to evidence in the record from which a reasonable jury could find in his or her favor on the UPTCPL claim. *See Lites,* 2000 WL 875698, at *3 (noting different standard applied in addressing motions to dismiss versus summary judgment motions); *see also Parasco v. Pacific Indem. Co.,* 870 F.Supp. 644, 648 (E.D.Pa. 1994), and *Parasco v. Pacific Indem. Co.,* 920 F.Supp. 647, 656-57 (E.D.Pa. 1996) (denying a motion to dismiss UTPCPL claim but later granting summary judgment on same claim after a review of the evidence failed to show misfeasance or raise a disputed issue of fact regarding the UTPCPL claim); *Seidman,* 40 F.Supp. 2d at 596 (while allegations of misfeasance may be sufficient to withstand a motion to dismiss, evidence of misfeasance is required to withstand a summary judgment motion). Thus, while arguably Plaintiff's Complaint *alleges* acts of misfeasance, Plaintiff's argument is fatally flawed because she fails to meet her burden under Rule 56 in opposing summary judgment.

The Court agrees with GEICO that there is no *evidence* in the summary judgment record which suggests misfeasance on the part of GEICO. There is no evidence in the record that GEICO intentionally submitted her medical bills and treatment to a biased PRO knowing that it would receive a determination as to the reasonableness and necessity of treatment which would allow it to deny her claims. Nor does evidence exist to support that GEICO possessed a financial incentive to limit first party benefits by utilizing a biased reviewer, the Prime Network, to deny those benefits, or that the Prime Network was biased in any way. In order to withstand summary judgment against her, Plaintiff must point to the specific evidence in the record that would be admissible at trial from which a reasonable jury could find in her favor. She cannot merely rely on her pleadings in opposing summary judgment. *Celotex,* 477 U.S. at 322-23; Fed.R.Civ.P.

56(e)(2).  In her brief in opposition to summary judgment, Plaintiff merely states that material issues of fact exist which preclude summary judgment as to her UTPCPL claim. Plaintiff does not identify what those material issues of fact are, nor does she cite, either in her brief or in her concise statement of material facts, to the specific evidence in the record which creates a material issue of fact.  Rather, the contentions of Plaintiff are merely arguments and conclusions, and thus do not constitute admissible evidence.

Accordingly, because the Plaintiff has failed to adduce any evidence to establish that GEICO engaged in misfeasance or, at least, to raise a material issue of fact in this regard, the Court concludes that, as a matter of law, no reasonable jury could return a verdict in her favor on her UTPCPL claim.  Thus, the Court recommends that GEICO's motion for summary judgment be granted on Plaintiff's UTPCPL claim.

### III.    CONCLUSION

For the reasons set forth above, the Court finds that no material issues of fact exist and Defendant GEICO is entitled to judgment as a matter of law.   Accordingly, it is respectfully recommended that the Motion for Summary Judgment (ECF  No. 27) filed by Defendant, GEICO General Insurance Company, be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2  of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections.  Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Dated: November 26, 2010        By the Court:

_____
LISA PUPO LENIHAN
Chief U.S. Magistrate Judge

cc:    All Counsel of Record
       *Via Electronic Mail*